ROGERS, Circuit Judge,
concurring:
I join the court’s opinion and write separately only to add a note of caution with regard to going beyond the Supreme Court’s decision in Sosa v. Alvarez-Machain, 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004), by reading too much into Sosa’s reference to the three norms of conduct identified by Blackstone as violations of international law prior to 1789. Although there is some historical evidence that the ATS as originally conceived was designed to prevent international incidents and harms to the foreign relations standing of the new nation, id. at 715-16, 124 S.Ct. 2739, no evidence has been identified to suggest that there is any talismanic quality to the so-called “Blackstone three,” Concurring Op. at 1098 (Williams, J.). Indeed, in Sosa, the Supreme Court recognized that other norms could be identified. See 542 U.S. at 732, 124 S.Ct. 2739. Our concurring colleague does not suggest there is any authority in the ATS’s 230-year history for requiring that Blackstone’s “three” bear a “family resemblance,” Concurring Op. at 1098 (Williams, J.), to one another or to these other norms, offering only one possible way of characterizing the analysis based on the premise — a dubious premise, given Sosa — that without such resemblance the “three” provide “little guidance for assessing candidates for ATS recognition,” id.
It would appear more prudent to take Sosa on its own terms. As noted, the Supreme Court cited Blackstone’s “three” merely as “historical paradigms” of norms that possessed sufficiently “definite content and acceptance” at the time of the statute’s enactment. 542 U.S. at 732, 124 S.Ct. 2739; see also id. at 724, 124 S.Ct. 2739. Separately, Sosa discussed the historical basis for the ATS, including the Marbois incident and other events surrounding the enactment of the Judiciary Act of 1789, id. at 716-19, 124 S.Ct. 2739, as well as the reasons for judicial caution before recognizing an ATS cause of action, id. at 725-28, 124 S.Ct. 2739; see Op. at 1093-94. Consequently, there is no basis for concluding that Sosa prevents courts from recognizing an international law norm unless its lineage can be traced to Blackstone’s “three.” It is, therefore, just as plausible, and likely more so, to conclude that Blackstone’s “three” were distinct and independent norms of international law as it existed in 1789, each of *1098 which may provide some insight regarding the definiteness a norm developed after 1789 must possess to justify recognition under the ATS.
Advisory or speculative musings on an issue neither briefed nor argued nor necessary to resolve the instant appeal seem particularly odd when the proffered analysis is bereft of substantive grounding. Indeed, in acknowledging the need to “expand[] the scope of the hypothetically triggered conflict to include international incidents more generally,” or to “inquir[e] whether the defendant’s alleged behavior might provoke war if the United States occupied no more than an average position in global power rankings,” Concurring Op. at 1100 (Williams, J.), our concurring colleague attempts to introduce vague and slippery concepts into the ATS analysis. This despite Sosa’s emphasis on the “definite content and acceptance” required of an international law norm, 542 U.S. at 732, 124 S.Ct. 2739, its discouraging of “judicial creativity,” id. at 728, 124 S.Ct. 2739, and its concern for “impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs,” id. at 727, 124 S.Ct. 2739. Considering traditional principles of judicial restraint, especially in light of Sosa’s specific grounds for caution in the ATS context, id. at 725-28, 124 S.Ct. 2739, further judicial analysis of the scope of the ATS is best postponed until the issue is ripe.
WILLIAMS, Senior Circuit Judge,
concurring:
I concur in the court’s opinion. But I think that in the context of this case it is appropriate to probe a little more into the meaning of the Alien Tort Statute (“ATS”), 28 U.S.C. § 1350. In Sosa v. Alvarez-Machain, 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004), the Court made clear that a current international law norm, if it is to find a home under the ATS, must have no “less definite content and acceptance ... than the historical paradigms familiar when § 1350 was enacted.” Id. at 732, 124 S.Ct. 2739. The Court was referring to the three offenses against the law of nations that Blackstone had identified as rules “overlapping] with the norms of state relationships,” namely “violation of safe conducts, infringement of the rights of ambassadors, and piracy.” Id. at 715, 124 S.Ct. 2739. There are two key features of the Court’s use of Blackstone to infer criteria for international law norms that might give rise to ATS claims. First, the opinion clearly sets forth definiteness as only a minimum criterion (one of several) for acceptance under the ATS: “Whatever the ultimate criteria for accepting a cause of action ..., we are persuaded that federal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance ....” Id. at 732, 124 S.Ct. 2739 (emphasis added). Second, though the Court clearly showed interest in analogizing from the three offenses, the opinion does not link the Blackstone three into an intellectually coherent family of wrongs. But unless the Blackstone examples exhibit some sort of family resemblance, they provide little guidance for assessing candidates for ATS recognition.
It seems to me that the unifying feature of the three offenses is that their punishment protects and facilitates the system of international relations arising out of the Westphalian view of national sovereignty, particularly with respect to the avoidance and termination of war. Piracy involves a rejection of the Westphalian system itself — pirates remove themselves from the national building blocks of international society (and hence are enemies of all mankind). See 4 William Blackstone, Commentaries *71 (noting that the pirate has *1099 “renounced all the benefits of society and government, and has reduced himself afresh to the savage state of nature, by declaring war against all mankind, all mankind must declare war against him”). Safe conducts, as Blackstone notes, were a matter of “public faith” — a promise by the sovereign that the entire nation needed to maintain — violation of which may “be a just ground of a national war.” Id. at *68-69. Offenses against ambassadors are an affront to the foreign sovereign himself, “as [ambassadors] represent the persons of their respective masters, who owe no subjection to any laws but those of their own country....” 1 William Blackstone, Commentaries *253. Both of these, moreover, facilitate negotiation among sovereigns, enabling them to head off war and, once war has begun, to bring it to an end.
The system of international relations implied from the Blackstone three, then, is one in which the threat of war among sovereigns is fully recognized, but international law, especially safe conducts and the rights of ambassadors, protect the system of diplomacy and intercourse among sovereign nations, and thereby curb the risk of war or its prolongation. 4 William Blackstone, Commentaries *66-68 (“The law of nations is a system of rules ... to decide all disputes, to regulate all ceremonies and civilities, and to insure the observance of justice and good faith, in that intercourse which must frequently occur between two or more independent states, and the individuals belonging to each. This general law is founded upon this principle, that different nations ought in time of peace to do one another all the good they can, and in time of war as little harm as possible, without prejudice to their own real interests— [0]ffences against this law are principally incident to whole states or nations, in which case recourse can only be had to war....”).
The ATS’s ability to ensure adequate “vindication of the law of nations,” Sosa, 542 U.S. at 717, 124 S.Ct. 2739, fits this paradigm nicely. The concern was that U.S. citizens might engage in incidents that could embroil the young nation in war and jeopardize its status or welfare in the Westphalian system. Id. at 715-18, 124 S.Ct. 2739. Similarly, foreign violators, if sufficiently linked to the United States, could create an incident threatening the United States’s peace. Indeed, under the Confederation, a French adventurer had assaulted a representative of France, one Francis Barbe Marbois, in Philadelphia. Lacking any national power over the miscreant, the Continental Congress directed the Secretary for Foreign Affairs to tell Marbois that “Congress have heard with extreme regret that an insult has been offered to one of the servants of his most Christian Majesty” and to explain how the federal character of the union impeded any direct punitive action. Kenneth C. Randall, Federal Jurisdiction over International Law Claims: Inquiries into the Alien Tort Statute, 18 N.Y.U.J. Int’l L. & Pol. 1, 25 (1985). Sosa in effect reads the adoption of the ATS (with other provisions) as the framers’ response to these international hazards. 542 U.S. at 715-20, 124 S.Ct. 2739.
For cases against American citizens violating the law of nations, there would likely be jurisdiction over violations of norms where the offense (especially if unpunished) would expose the United States to the risk of war, and perhaps to other comparable risks. That principle obviously would encompass an American’s assault on a foreigner present in the U.S. under a safe conduct (or anywhere in the world under a U.S.-issued safe conduct). Other international law violations by Americans meeting the definiteness test and risking America’s exposure to foreign conflict might also fit.
*1100 As to cases against foreigners, violations of the law of nations would be actionable under the ATS if they matched piracy as an affront to Westphalian sovereignty itself, or if the foreign perpetrator were linked to the United States by residence or by some other feature such that American disregard of the offense might cause serious blame to fall on the United States. Thus Blackstone, speaking of safe conduct violations, points to “the interest as well as duty of the government, under which [violators] live, to animadvert upon them with a becoming severity, that the peace of the world may be maintained.” 4 William Blackstone, Commentaries *68 (emphasis added).
To be sure, given the United States’s current military and economic position, few states would respond to a Marbois-like incident by declaring war. But the Westphalian framework can be adapted — either by expanding the scope of the hypothetically triggered conflict to include international incidents more generally, or by inquiring whether the defendant’s alleged behavior might provoke war if the United States occupied no more than an average position in global power rankings.
Of course, Sosa’s insistence on prudential concerns forms an additional overlay on this conceptual framework, as it would on any. Even where plaintiffs can demonstrate a definite norm (and, under this conceptual framework, one that meets the Westphalian purpose), a court would still have to consider the practical consequences of recognizing a cause of action under the ATS.